**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:13-CV-105-RLV-DCK**

| | | |
|---|---|---|
| **JEREMY R. REID,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **DALCO NONWOVENS, LLC;** | ) | |
| **JASON LOGAN; AND** | ) | |
| **RALPH SHERMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant Dalco Nonwovens, LLC's

Motion for Summary Judgment (the "Motion"). [Doc. No. 41]. After a thorough examination of

the record, the parties' briefs, and applicable law, the Court enters the following Order on the

Defendant's Motion for the reasons discussed more thoroughly below.

## I.     BACKGROUND

### A.     Factual Background

#### 1.     *Contextual Background*

Dalco is a manufacturing company located in Conover, North Carolina. A primary facet of

its business is to manufacture an assortment of base fabrics from shredded raw fibrous materials.

Once created, Dalco's base fabrics are commonly used in connection with a wide-variety of

consumer and industrial applications and products.

To accomplish its business objectives, Dalco's factory has set-up three automated "lines"

– Line One, Line Two, and Line Three – to process the raw fiber materials into usable fabrics. *See*,

*e.g.*, [Doc. No. 47] at pp. 21-22, 25-26 (Logan Depo.). The way each line works is as follows: a

"hopper operator" brings the raw material to the line via a forklift; each bale of raw material is held together by several straps, which must then be removed by the hopper operator prior to processing; once the straps are removed, the bale of raw material is "fed" by the operator into the line machine on a conveyor belt; the conveyor then transports the material to a feeding area (i.e., the hopper) where it is processed by a "willow" (a rotating wheel with teeth), which breaks up and grinds the raw fibers; the ground fibers are then carried out the end of the machine in a crude, yet processed form; at that point, the machine presses and rolls the processed fiber so it can be utilized for commercial purposes. *See* [Doc. No. 49] at pp. 46-47 (Greenwood Depo.); [Doc. No. 47] at pp. 19, 21-22 (Logan Depo.); [Doc. No. 54] at pp. 91-104 (Plaintiff Depo.). If a hopper runs out of fiber material, an alarm sounds – indicating that more fiber needs to be added to prevent damaging the machine. *See* [Doc. No. 54] at pp. 104-105 (Plaintiff Depo.). Dalco runs two twelve (12) hour line shifts each day – a day shift and a night shift – in order to keep the hoppers running and to meet its customers' needs. [Doc. No. 52] at p. 7 (Ashworth Depo.).

Each line (and, correspondingly, each shift) is typically managed by a team leader or line operator, a "winder operator," and a hopper operator. [Doc. No. 47] at pp. 10-11, 13 (Logan Depo.). A shift supervisor oversees each of the lines during his shift; however, during a shift supervisor's absence, a particular line's team leader assumes a limited supervisory role over his line, such as "direct[ing] and mak[ing] assignments to other employees on the line" and "direct[ing] how particular work is . . . performed." *Id.*; [Doc. No. 41-5] at p. 1 (¶ 3) (Sigmon Decl.). A team leader is primarily responsible for keeping his line running smoothly and making sure other line workers are doing their assigned jobs. [Doc. No. 41-5] at p. 1 (¶ 3) (Sigmon Decl.); [Doc. No. 47] at pp. 17-18 (Logan Depo.). As part of the manufacturing process, a hopper operator must keep his area clean by gathering and dumping the removed bale straps and bale packaging

into a specified baler for recycling. *See* [Doc. No. 54] at p. 95 (Plaintiff Depo.); [Doc. No. 52] at pp. 42-43 (Ashworth Depo.). The hopper operator must also take care not to allow any bale packaging or bale straps to fall into the hopper or otherwise enter the machine; else, significant and costly damage to the machine could result. *See*, *e.g.*, [Doc. No. 54] at p. 93 (Plaintiff Depo.); [Doc. No. 52] at p. 64 (Ashworth Depo.); [Doc. No. 47] at p. 24 (Logan Depo.).

Plaintiff, an African-American male, began working as a night shift hopper operator at Dalco on July 16, 2012. [Doc. No. 27] at p. 2 (¶ 13) (Second Amend. Compl.); [Doc. No. 30] at p. 2 (¶ 13) (Dalco's Answer to Second Amend. Compl.); [Doc. No. 54] at pp. 43, 80-83 (Plaintiff Depo.). As a hopper operator, Plaintiff had the following relevant and essential job duties: unloading incoming raw materials; servicing needle boards; operating a forklift; keeping hoppers loaded, level, and consistent with specified fiber material; monitoring hoppers to ensure they operate properly and remain clean; performing "[o]ther duties as needed;" and "work[ing] effectively in a team environment." [Doc. No. 54] at pp. 80-83 (Plaintiff Depo.); [Doc. No. 54-1] at Ex. 2 (Plaintiff Depo.).

At the time of his hire, Plaintiff was primarily obligated to perform those assigned duties with respect to Line One. [Doc. No. 54-1] at Ex. 2 (Plaintiff Depo.). However, Plaintiff was also obligated to "watch" other lines "while [a line's] operator [was] away" by performing "the same" hopper duties, as required, with respect to the additional line.[1] *Id.* Occasionally, when Dalco is short-staffed during a shift, an on-duty hopper operator might be required to assume the responsibilities of an absent colleague on a different line, as circumstances require. *See*, *e.g.*, [Doc. No. 47] at pp. 25-26 (Logan Depo.); [Doc. No. 52] at p. 65 (Ashworth Depo.); [Doc. No. 54] at pp. 82-83 (Plaintiff Depo.); *accord* [Doc. No. 41-5] at p. 2 (¶ 6) (Sigmon Decl.). However, this is

---

[1] Dalco originally had only two lines. It opened Line Three sometime just prior to October 31, 2012. *See* [Doc. No. 47] at pp. 25, 32 (Logan Depo.).

a rare occurrence and efforts are made to call-in additional help prior to having an on-duty hopper operator assume such additional duties. *See* [Doc. No. 52] at pp. 44, 65 (Ashworth Depo.); [Doc. No. 52] at Ex. 4 (Ashworth Depo.).

While at Dalco, Plaintiff was assisted by Adam Sigmon ("Sigmon"), a white male and the night shift team leader on Line One. [Doc. No. 54] at p. 37 (Plaintiff Depo.); [Doc. No. 41-5] at p. 1 (¶ 2) (Sigmon Decl.). Jason Logan, an African-American male, was Plaintiff's night shift supervisor. [Doc. No. 54] at pp. 34, 36-37 (Plaintiff Depo.); [Doc. No. 47] at p. 6 (Logan Depo.). Plaintiff and Sigmon reported to Logan. [Doc. No. 41-5] at p. 1 (¶ 3) (Sigmon Decl.); *accord* [Doc. No. 47] at pp. 10-11, 13 (Logan Depo.). Logan reported to Scott Greenwood, Dalco's plant manager, as well as Mark and Joy Evans, Dalco's owners and officers. *See* [Doc. No. 47] at pp. 8-9 (Logan Depo.); [Doc. No. 49] at p. 7 (Greenwood Depo.); *accord* [Doc. No. 48] at p. 5 (M. Evans Depo.); [Doc. No. 50] at p. 5 (J. Evans Depo.). Greenwood and the Evanses are the only persons capable of terminating Dalco employees. *See* [Doc. No. 49] at pp. 11-12 (Greenwood Depo.); [Doc. No. 48] at pp. 7-8 (M. Evans Depo.); [Doc. No. 50] at pp. 7-8 (J. Evans Depo.); *accord* [Doc. No. 47] at p. 15 (Logan Depo.) (testifying he could only recommend that workers be terminated); [Doc. No. 41-5] at p. 1 (¶ 3) (Sigmon Decl.) (testifying he has no authority to hire, fire, or discipline Dalco employees); [Doc. No. 54] at p. 233 (Plaintiff Depo.) (testifying that, to his knowledge, neither Sherman nor Sigmon had the authority to fire him from Dalco). Logan, however, as shift supervisor, could commence disciplinary action (such as "write ups") against employees working under his authority. [Doc. No. 47] at pp. 16-17 (Logan Depo.).

During Plaintiff's employment, Dalco had in place an anti-harassment and anti-discrimination policy (the "Anti-Discrimination Policy" or "Policy"). *See* [Doc. No. 54-1] at Exs. 4, 7 (Exhibits to Plaintiff's Depo.). Dalco's Anti-Discrimination Policy provides, in pertinent part,

that harassment of any kind, but specifically harassment on the basis of race, is prohibited. *Id.* It further provides that if an employee "feels [the] policy has been violated," then such employee should immediately register either a verbal or written complaint with a supervisor, manager, or either of the Evanses. *Id.* The Policy also states that no retaliation will result against any employee who reports a complaint in good faith. *Id.* Plaintiff testified that he read and understood the Policy at the time of his hire. *See* [Doc. No. 54] at pp. 89-90 (Plaintiff Depo.); [Doc. No. 54-1] at Exs. 3, 4 (Exhibits to Plaintiff's Depo.).

## 2. *Encounters with Logan*

Plaintiff tried to avoid interactions with Logan by doing his job and staying out of Logan's way. [Doc. No. 54] at pp. 127-28, 160 (Plaintiff Depo.). Plaintiff testified that, during his first day at Dalco, Logan verbally accosted him. *Id.* at p. 128 (Plaintiff Depo.). As time progressed, Logan physically accosted Plaintiff as well. Specifically, Plaintiff testified that Logan hit him on the head, "cut him off" as he was walking, and slapped his hand while he was operating a machine sometime during late-October 2012. [Doc. No. 54] at pp. 129, 131, 158-59, 202, 206-207 (Plaintiff Depo.). Logan also "bounced" Plaintiff twice as he was walking into the plant. *Id.* at 130-31 (Plaintiff Depo.). Plaintiff has not testified to any specific dates of physical abuse that precede October 2012. Logan also spoke disrespectfully of Plaintiff to other employees, and Plaintiff claims that he was the only employee of whom Logan spoke ill. *Id.* at pp. 134-35 (Plaintiff Depo.). However, Plaintiff did not testify as to the specific contents or contexts of Logan's conversations. Plaintiff further testified that Logan once disciplined him (i.e., wrote him up) for failing to allow the willow to stop spinning on Line One before attempting to clean out the hopper (a failure Plaintiff admits could have caused him serious harm). *See id.* at pp. 105-106, 136-37 (Plaintiff Depo.).

On October 24, 2012, Plaintiff sent Logan a text message asking for additional hours at work. [Doc. No. 54] at pp. 126, 168 (Plaintiff Depo.). Logan rebuffed Plaintiff's request, replying with "N****, please" and "[w]hatever, N*****." *Id.* at p. 127 (Plaintiff Depo.). Logan always used the N-word toward Plaintiff. *Id.* at p. 132 (Plaintiff Depo.). Plaintiff considers the N-word racist and was offended when Logan used it. *Id.* at pp. 126-27 (Plaintiff Depo.). Plaintiff reported the text messaging incident and the hand slapping incident to Greenwood sometime on or after October 26, 2012. *Id.* at p. 203-204 (Plaintiff Depo.); [Doc. No. 49] at p. 19 (Greenwood Depo.). Greenwood discussed the texting incident with Joy Evans and the decision was made to terminate Logan. [Doc. No. 49] at pp. 19-22 (Greenwood Depo.); [Doc. No. 50] at p. 20 (J. Evans Depo.). Joy Evans decided to terminate Logan because the language used in the text message violated Dalco's Anti-Discrimination Policy. [Doc. No. 50] at p. 18, 20 (J. Evans Depo.). Logan was terminated on October 31, 2012. [Doc. No. 47] at p. 32 (Logan Depo.); *accord* [Doc. No. 54] at p. 203 (Plaintiff Depo.).

### 3. *Encounters with Sherman*

During Plaintiff's employment with Dalco, Ralph Sherman was a hopper operator just like Plaintiff; however, Sherman worked on Line One's day shift. [Doc. No. 54] at pp. 43, 46-47 (Plaintiff Depo.); [Doc. No. 46] at pp. 11-12 (Sherman Depo.). Plaintiff knew that Sherman was simply a co-worker and had no supervisory powers over him. *See* [Doc. No. 54] at pp. 41-42, 173, 233, 275-76 (Plaintiff Depo.). Even so, Plaintiff testified that Sherman treated him in a disrespectful manner, causing him to have a "hard time" during his employment. Because of this treatment, Plaintiff tried to avoid him. *Id.* at p. 256 (Plaintiff Depo.).

On Plaintiff's first day, Sherman introduced himself and stated that Dalco has "had a lot of racial turnover" and asked Plaintiff if "[he] think[s] [he is] going to be around?" [Doc. No. 54] at

p. 268-69 (Plaintiff Depo.). Sherman would inspect Plaintiff's workstation prior to relieving him at the end of his shift. [Doc. No. 54] at pp. 184-85, 265 (Plaintiff Depo.). During one inspection, Sherman took pictures of the machine (for an unspecified reason) and threatened to "tell Mr. Logan" that Plaintiff was not doing his job. *Id.* (Plaintiff Depo.). During other inspections, Sherman would "nitpick" Plaintiff's work area and say "[w]e're going to get rid of you."[2] *Id.* at pp. 265-66 (Plaintiff Depo.). On another unspecified date, Sherman left bale wrappers and straps near the machine and told Plaintiff to "get it [up]." *Id.* at p. 257 (Plaintiff Depo.).

On November 12, 2012, Sherman and Plaintiff had a verbal exchange. Sherman remarked toward Plaintiff: "You really think you got this job down, don't you?" *Id.* at p. 267 (Plaintiff Depo.). Sherman then told Plaintiff that he was "a rookie." *Id.* at pp. 173-74 (Plaintiff Depo.). Sherman again told Plaintiff that "they would have to see about getting rid of [him]," that he (i.e., Sherman) has "been here a long time," and that he "ain't worried about going nowhere." [Doc. No. 54] at pp. 172-74 (Plaintiff Depo.). Plaintiff understood "they" to mean Dalco. *Id.* at p. 173 (Plaintiff Depo.).

On December 30, 2012, Plaintiff was working on the day shift to assist with inventory and gain extra hours. [Doc. No. 54] at pp. 178-79, 262 (Plaintiff Depo.). As Plaintiff finished his work and prepared to leave, Sherman began driving a forklift toward him. *Id.* at pp. 179, 262 (Plaintiff Depo.). Sherman pursued Plaintiff as he tried to move away from Sherman. *Id.* (Plaintiff Depo.). While Plaintiff walked away from the forklift, he heard Sherman exclaim "I'm getting ready to run this boy over." *Id.* (Plaintiff Depo.). Plaintiff seemed to testify that Sherman said this multiple times. *See*, *e.g.*, *id.* The forklift was "less than two or three feet" from Plaintiff and was moving faster than him. *Id.* at p. 182 (Plaintiff Depo.). Plaintiff was scared for his safety. *Id.* at pp. 182, 185

---

[2] Plaintiff testified that Sherman said this to him between three to five times during his employment. [Doc. No. 54] at p. 266 (Plaintiff Depo.).

(Plaintiff Depo.). However, Sherman never hit Plaintiff with the forklift. *Id.* at pp. 182, 255 (Plaintiff Depo.). The entire incident lasted "[a] couple of seconds." *Id.* at p. 260 (Plaintiff Depo.).

As the forklift incident transpired, Dalco manager Scott Greenwood was a few feet away and within earshot. *Id.* at pp. 179-81 (Plaintiff Depo.). No other employees were close enough to witness Sherman's behavior. *Id.* at p. 263 (Plaintiff Depo.). At the time, it "was quiet" because the only noise came from the forklift. *Id.* at pp. 180-81 (Plaintiff Depo.). Plaintiff shouted "Scott!" in an attempt to get Greenwood's assistance. *Id.* at pp. 182-83 (Plaintiff Depo.). However, Greenwood "brushed . . . off" Plaintiff's call for help and "didn't say nothing" to Sherman. *Id.* (Plaintiff Depo.).

Plaintiff considered Sherman's use of the word "boy" to be a racial in nature. [Doc. No. 54] at pp. 184, 186 (Plaintiff Depo.). To Plaintiff, the word "boy" is a racial slur no matter the context. *Id.* at p. 258 (Plaintiff Depo.). Plaintiff has not heard Sherman use the word "boy" toward anyone else. *Id.* at p. 256 (Plaintiff Depo.). Logan testified that Sherman has called him "boy." [Doc. No. 47] at p. 42 (Logan Depo.). Sherman testified that he uses the term "boy" to refer to both white and black people. [Doc. No. 46] at p. 33 (Sherman Depo.).

4.    *Other Pre-Suspension Incidents*

Sometime prior to October 31, 2012, Plaintiff had a lock attached to his work locker, in which he kept tools for cleaning the willow. *See* [Doc. No. 54] at pp. 116-20 (Plaintiff Depo.). While Plaintiff was off from work, someone cut the lock with bolt cutters. *Id.* Plaintiff requested and received a new lock from Jason Logan. *Id.* The second lock was cut off on November 11, 2012. *Id.* Plaintiff received a third lock on January 10, 2013. *See id.* at pp. 170-72 (Plaintiff Depo.). No evidence in the record indicates who cut Plaintiff's locks. On December 20, 2012, Plaintiff came to work only to discover that his name had been scratched off of his locker. [Doc. No. 54] at

pp. 176, 178 (Plaintiff Depo.). During his deposition, Sherman testified that he had scratched Plaintiff's name off his locker. *See* [Doc. No. 46] at pp. 26-27 (Sherman Depo.). Plaintiff also testified that, following Logan's termination, other employees, including Sherman, but not management or Sigmon, verbally antagonized him for getting Logan fired. *See* [Doc. No. 54] at pp. 187-88 (Plaintiff Depo.).

On January 10, 2013, Plaintiff received a verbal disciplinary warning from Karl Ashworth[3] for allowing two bale straps to enter the hopper on Line One. *See* [Doc. No. 54] at pp. 107-109 (Plaintiff Depo.); [Doc. No. 52] at pp. 28-40 (Ashworth Depo.). Plaintiff denied responsibility for this incident. *See* [Doc. No. 54] at pp. 107-109 (Plaintiff Depo.); [Doc. No. 52] at pp. 28-40 (Ashworth Depo.). After Plaintiff's meeting with Ashworth, Plaintiff met with Joy Evans and Dana Williams (Dalco's human resources professional). During that meeting, Plaintiff informed Joy Evans of the mistreatment he had been experiencing. [Doc. No. 50] at pp. 20-27 (J. Evans Depo.); [Doc. No. 54] at pp. 115-20 (Plaintiff Depo.). Plaintiff specifically named Sherman and did not provide Mrs. Evans with the names of any others. [Doc. No. 50] at pp. 20-27 (J. Evans Depo.); [Doc. No. 54] at pp. 115-20 (Plaintiff Depo.). Plaintiff complained that Sherman had called him a "rookie" and had otherwise given him a "hard time." [Doc. No. 50] at pp. 20-27 (J. Evans Depo.); [Doc. No. 54] at pp. 115-20 (Plaintiff Depo.). He also informed her that the locks on his locker had been cut and that the name on his locker had been scratched out. [Doc. No. 50] at pp. 20-27 (J. Evans Depo.); [Doc. No. 54] at pp. 115-20 (Plaintiff Depo.). Plaintiff represented to Mrs. Evans that he had the locks at home and would provide them, along with other documentation at a later date. [Doc. No. 50] at pp. 20-27 (J. Evans Depo.); [Doc. No. 54] at pp. 115-20 (Plaintiff Depo.).

---

[3] Once Logan was terminated, Karl Ashworth assumed Logan's supervisory role over the night shift. *See*, *e.g.*, [Doc. No. 41-5] at p. 1 (¶ 4) (Sigmon Decl.).

Mrs. Evans referred Plaintiff's complaints to Greenwood, who then spoke with Plaintiff, Adam Sigmon, and some other employees from Plaintiff's shift. *See* [Doc. No. 49] at pp. 25-28 (Greenwood Depo.); [Doc. No. 50] at pp. 24-25 (J. Evans Depo.). Greenwood does not recall speaking with Sherman. [Doc. No. 49] at p. 28 (Greenwood Depo.). Mrs. Evans testified that her investigation into Plaintiff's claims could not proceed until Plaintiff provided Dalco with the documentation he alluded to during their meeting and the names of the persons he suspected had cut off his locks and scratched his name off his locker. *See* [Doc. No. 50] at p. 49 (J. Evans Depo.).

Joy Evans did not find out about the forklift incident until the late-fall of 2013, when she was told about it by Greenwood after Plaintiff was suspended from work. [Doc. No. 50] at pp. 34-35 (J. Evans Depo.); [Doc. No. 51] at pp. 91-92 (J. Evans Depo.); *accord* [Doc. No. 42] at p. 12 (Plaintiff's Opposition Brief). In relaying the incident to her, Greenwood stated that "Ralph [was] being Ralph" and "[gave] [Plaintiff] a hard time . . . ." *Id.* On December 19, 2013, Mrs. Evans disciplined Sherman for the forklift incident and for making comments to Plaintiff about "'hav[ing] to see about getting' rid of him." [Doc. No. 42-1] at p. 2 (Counseling Form). Sherman was suspended for one week and placed on a six month probation. *Id.*

### 5. *Suspension and Cessation of Employment*

Plaintiff was subsequently suspended from Dalco because of events that took place during a night shift that occurred between January 18 and 19, 2013. That night, another employee, Justin Mayfield, called Ashworth and claimed that he could not come into work because he was involved in a car accident. *See* [Doc. No. 52] at pp. 43-44 (Ashworth Depo.). Mayfield was the hopper operator scheduled to work on Line Three. *Id.* at p. 44 (Ashworth Depo.). Following the call, Ashworth attempted to call-in other employees to have one of them fill in for Mayfield's Line Three shift. *Id.* Ashworth was unable to find someone to cover for Mayfield. *Id.* Consequently,

Ashworth contacted Sigmon sometime during Plaintiff's shift and notified him that Plaintiff needed to operate both the Line One and Line Three hoppers. [Doc. No. 52] at p. 44 (Ashworth Depo.); *accord* [Doc. No. 41-5] at p. 3 (Attachment) (Sigmon Decl.); [Doc. No. 54] at p. 147 (Plaintiff Depo.). Because Ashworth thought both lines were running light weight fabrics, he did not believe it would be a problem for Plaintiff to run both lines. [Doc. No. 52] at p. 44 (Ashworth Depo.); *accord* [Doc. No. 41-5] at p. 1 (¶ 6) (Sigmon Decl.).

Sigmon communicated Ashworth's directive to Plaintiff. Plaintiff initially refused to comply. [Doc. No. 54] at p. 147 (Plaintiff Depo.). At some point thereafter, Line Three ran out of fiber material and Plaintiff told Line Three's leader that he could not feed the hopper because he could not physically keep up with both lines. *Id.* at pp. 148-49 (Plaintiff Depo.). Plaintiff stated that he would continue focusing on Line One. *Id.* Following this shift, Plaintiff was suspended indefinitely pending an investigation into his insubordination. Plaintiff filed for unemployment benefits within days of being suspended. Plaintiff never returned to work at Dalco.

6.    *EEOC Charges and Litigation*

On November 15, 2012, Plaintiff filed a discrimination charge with the EEOC. [Doc. No. 54-1] at Ex. 13 (Plaintiff Depo.). Therein, Plaintiff alleged that he had been discriminated against on the basis of his race and color. *Id.* Plaintiff's allegations arose from Logan's manner of treating him. *Id.* On February 5, 2013, Plaintiff filed a second charge of discrimination with the EEOC. [Doc. No. 54-1] at Ex. 14 (Plaintiff Depo.). In his second charge, Plaintiff alleged that he had suffered from unlawful retaliation. *Id.* He alleged that he had been "wrongly disciplined" through a suspension, which occurred on January 23, 2013. *Id.*

## B.    Procedural Background

Defendant Dalco moved for summary judgment on July 24, 2015. [Doc. No. 41] (Defendant's Motion). Defendant has moved on limited issues, but has nonetheless challenged each claim Plaintiff has asserted against it. *Id.* Plaintiff has opposed the Defendant's Motion. [Doc. No. 42] (Plaintiff's Opposition Brief). This matter is currently scheduled for trial during the Court's January 2016 Term.

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *accord Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).

It is well-established that the mere existence of "some" factual disputes will not defeat summary judgment; rather, the dispute presented must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247-248 (emphasis in original); *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Only legitimate disputes over facts that might affect the outcome of the suit under relevant governing law fall within that category. *See Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th Cir. 2012). A dispute is "genuine" if "a reasonable jury could return a

verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts are not genuine or significant and do not cast sufficient doubt on the validity of testimony to preclude the entry of summary judgment. *Emmett*, 532 F.3d at 297; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, 532 F.3d at 297 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Although it is certainly true that "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party," *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), it is equally true that a court is "well within its discretion in refusing to ferret out the facts [and inferences] that counsel has not bothered to excavate." *Cray Commc'ns. Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994).

### B.      Federal Claims of Discrimination and Retaliation Under Title VII

Title VII of the Civil Rights Act of 1964, as amended, prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C.A. § 2000e-2(a)(1). Title VII may be violated either by an employer's disparate treatment of an individual, if the disparate treatment is based upon the individual's race, or through the creation of a racially hostile work environment. *See*, *e.g.*, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015); *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992). An employer may also be liable if it retaliates against an individual for bringing to light either an actual or developing racially discriminatory

condition at the employer's workplace. *See Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). A cause of action under Title VII cannot be maintained against an *individual* defendant, however. *See*, *e.g.*, *Reid v. Dalco Nonwovens, LLC*, 2014 U.S. Dist. LEXIS 98642, at *12-13 (W.D.N.C. 2014).

At the summary judgment stage, the plaintiff carries the initial burden of establishing the *prima facie* elements of his claims under Title VII upon challenge by an adverse party. This burden is met by utilizing either direct or circumstantial evidence. *See Engler v. Harris Corp.*, 2015 U.S. App. LEXIS 17622, at *5 (4th Cir. 2015). Plaintiff alleges that Dalco, Sherman, and Logan subjected him to (1) disparate treatment based on his race, (2) a racially hostile work environment, and (3) unlawful retaliation for complaining of racially discriminatory conditions in his workplace. Defendant Dalco has challenged the Plaintiff's ability to state a *prima facie* case against it (with respect to only certain elements) on each of these claims. The Court addresses each of the parties' arguments in turn.

### 1.    *Disparate Treatment Claims*

Plaintiff first argues that Dalco subjected him to disparate treatment based upon his race. In doing so, Plaintiff's brief has identified only two instances of alleged disparate treatment. Specifically, Plaintiff argues that Ashworth discriminatorily issued him a verbal reprimand for allowing bale straps to enter into the Line One hopper, while three white employees were not similarly reprimanded for the same offense. [Doc. No. 42] at p. 16 (Plaintiff's Opposition Brief). Plaintiff also argues that he was suspended and terminated by Dalco based on his race. *Id.* Plaintiff has adduced no direct evidence which indicates that either Ashworth (the Dalco employee who reprimanded Plaintiff) or Joy Evans (the Dalco officer who suspended and terminated Plaintiff) held any discriminatory animus toward him or took action against him for discriminatory reasons.[4]

---

[4]  The Fourth Circuit has defined direct evidence as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67

Consequently, Plaintiff must establish a *prima facie* claim for disparate treatment under Title VII utilizing the *McDonnell Douglas* burden-shifting framework.[5] Defendant Dalco has challenged Plaintiff's ability to present a *prima facie* case of disparate treatment.

A *prima facie* case of race discrimination under Title VII arising from an alleged disparate enforcement of employee disciplinary measures or discriminatory discharge requires a plaintiff to show: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) he suffered different treatment from similarly situated employees outside his protected class. *See*, *e.g.*, *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190-91 (4th Cir. 2010); *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002); *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).

In order to create a triable issue regarding the second prong, a plaintiff must proffer evidence of a genuine dispute concerning whether, "at the time of his dismissal, he was performing his job in a way that met the legitimate expectations of [the defendant]. Specifically, the Court looks to the perception of the decision-maker in considering whether the employee was meeting job expectations at the time of dismissal." *Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F. Supp. 2d 717, 725 (E.D. Va. 2013) (citing *Evans*, 80 F.3d at 960-61), *aff'd by* 592 Fed. App'x 158 (4th Cir. 2014); *accord Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980). To demonstrate a triable issue

---

F.3d 1137, 1142 (4th Cir. 1995); *see also EEOC v. Clay Printing Co.*, 955 F.2d 936, 941-42 (4th Cir. 1992). Indeed, direct evidence "demonstrate[s] that a protected trait . . . actually played a role in the employer's decision-making process and had a determinative influence on the outcome." *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 342 n. 7 (4th Cir.2008) (quotations omitted). Plaintiff has not presented direct evidence that Ashworth or Joy Evans bore a discriminatory attitude toward Plaintiff based on his race.

[5] Title VII also allows a plaintiff to pursue liability against an employer under a "mixed-motive" analysis. *See EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 n.2 (4th Cir. 2004). Here, Plaintiff has not argued a mixed-motive theory of liability in response to the Defendant's motion for summary judgment. Therefore, the Court has not considered the merits of any such argument..

on the fourth prong, a plaintiff must show that employees outside his protected class were similarly situated in all relevant respects, though they need not have engaged in "precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances[.]" *Cook*, 988 F.2d at 511. In most cases, however, "[t]o be similarly situated the employees must have been disciplined by the same supervisor." *McDougal-Wilson v. Goodyear Tire and Rubber Co.*, 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006); *see also Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007) ("If different decision-makers are involved, employees are generally not similarly situated.").

i.  VERBAL REPRIMAND

With regard to Ashworth's verbal reprimand of Plaintiff for allowing bale straps to enter the Line One hopper, Plaintiff claims that Sherman and two other white employees were not similarly disciplined for a comparable incident. *See* [Doc. No. 42] at pp. 7, 16 (Plaintiff's Opposition Brief). In support of his argument, Plaintiff cites to Sherman's deposition testimony, wherein Sherman testified that he had never been "written up" for accidentally allowing bands to enter the machine and neither had a "couple of other [white] guys." *See* [Doc. No. 46] at pp. 44-45 (Sherman Depo.). Defendant responds that Plaintiff's argument is insufficient to surpass summary judgment because Ashworth's uncontroverted testimony shows that he was unaware of any other operator at Dalco having ever committed the same infraction. *See* [Doc. No. 45] at p. 4 (Defendant's Reply); *see also* [Doc. No. 52] at pp. 36-37 (Ashworth Depo.).

The Court is persuaded that Plaintiff has failed to demonstrate a triable issue regarding this disparate treatment claim. First, Plaintiff has not pointed to any evidence in the record which demonstrates that a verbal reprimand and a "write up" are equivalent punishments – thus, his

attempt to demonstrate that three white employees were not "written up" for an incident for which he received a verbal reprimand falls flat.

Second, Defendant accurately points out that, at the time of his deposition, Ashworth had no knowledge of either (1) any white employees who improperly allowed bale straps to enter their machine, or (2) any white employees who did so and were not disciplined in the same manner as Plaintiff. *See* [Doc. No. 52] at pp. 36-37 (Ashworth Depo.). Indeed, though Ashworth had encountered similar incidents while employed elsewhere, during his time at Dalco he had only witnessed or been apprised of a single circumstance where a bale strap improperly enter a machine – i.e., the one involving Plaintiff. *Id.* The knowledge held by a decision maker is critical in the discrimination context. *See*, *e.g.*, *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (holding that a Title VII disparate treatment claim failed where it was undisputed that the decision-maker did not know the plaintiff's race); *accord Woodman v. WWOR-TV*, Inc., 411 F.3d 69, 81-83 (2d Cir. 2005) (holding that an ADEA claim failed for lack of proof of the decision-maker's knowledge that the plaintiff's replacement was substantially younger). Where a decision-maker is aware of only one of two similar incidents, there can be no comparison drawn between how those involved in the incidents were treated. *See*, *e.g.*, *Pettis*, 980 F. Supp. 2d at 729. Because Ashworth had no knowledge of any white employees not being "written up" for a similar infraction, those incidents are not a proper comparator to the disciplinary action taken against Plaintiff.

Third, Plaintiff has not shown that Ashworth was in a position to discipline Sherman and the two other white employees at the time of their infractions. Ashworth only became Plaintiff's supervisor after Logan was terminated. There is no evidence in the record that Ashworth supervised both Sherman and Plaintiff at the respective relevant times. Plaintiff has not shown that Plaintiff, Sherman, and the other white employees were similarly situated because he has failed to

show that they were each supervised by Ashworth at the time of their infractions. *See, e.g.*, *Forrest*, 245 F. App'x at 257. Thus, Plaintiff has not created a triable issue regarding the manner in which Ashworth disciplined Plaintiff.[6]

                      ii.     SUSPENSION AND TERMINATION

Regarding Plaintiff's suspension and ultimate termination,[7] Defendant argues that Plaintiff cannot satisfy his *prima facie* case for disparate treatment because he did not satisfactorily perform his job duties so as to fulfill the legitimate expectations of his employer.[8] Defendant argues that Plaintiff undeniably refused to feed the hoppers on both Lines One and Three during his final shift on the night/morning of January 18 and 19, 2013. [Doc. No. 41-1] at pp. 12-13 (Defendant's Motion). Defendant argues that such insubordination fails to meet an employer's legitimate expectations as a matter of law. *Id.* Plaintiff argues that it is disputed whether he could physically perform the task given during his final shift at Dalco (i.e., to feed both the Line One and Line Three hoppers). *See* [Doc. No. 42] at pp. 17-18 (Plaintiff's Opposition Brief).

The Court is persuaded that, at this juncture, Plaintiff has demonstrated a triable issue regarding his suspension and termination. As part of his acknowledged job responsibilities, Plaintiff had to manage the Line One hopper, and also the hoppers on other lines when required. *See* [Doc. No. 54] at pp. 80-83 (Plaintiff Depo.); [Doc. No. 54-1] at Ex. 2 (Plaintiff Depo.). Plaintiff was obligated to "work effectively in a team environment" and perform "[o]ther duties as needed."

---

[6] The Court is also not entirely convinced that Fourth Circuit precedent treats a verbal reprimand as an adverse employment action. *See, e.g.*, *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (holding that a written reprimand does not qualify as an adverse employment action when the reprimand itself does not lead to further discipline).

[7] Defendant claims that Plaintiff was not ultimately terminated by Dalco; rather, Defendant contends that Plaintiff quit when he filed for unemployment benefits. Plaintiff claims that he did not quit his job. Instead, he argues that he filed for unemployment only to support his family and that Defendant terminated him by never reinstating him following his suspension. The Court finds that this dispute is factual in nature and must be construed in Plaintiff's favor for purposes of summary judgment.

[8] The Court notes that Defendant has challenged only the "legitimate expectation of the employer" prong of Plaintiff's *prima facie* case for this particular claim. [Doc. No. 41-1] at pp. 12-13 (Defendant's Motion).

[Doc. No. 54] at pp. 80-83 (Plaintiff Depo.); [Doc. No. 54-1] at Ex. 2 (Plaintiff Depo.). Though it is a rare occurrence, it was not unheard of for Dalco's hopper operators to manage multiple lines during their shift, and Plaintiff had previously done so "more than once." On the January 18, 2013 night shift, the hopper operator on Line Three was absent because of an emergency. Because he thought both Lines One and Three were scheduled to run a light weight fabric, Ashworth directed Sigmon to have Plaintiff run the hoppers on both lines. Plaintiff admits that he initially refused to do so. However, testimony shows that Plaintiff later attempted to run fiber on both hoppers. Plaintiff claims that he could not physically continue filling the Line Three hopper. Eventually, Line Three's hopper ran out of fabric, causing an alarm to sound. Plaintiff was suspended by Joy Evans pending an investigation into his alleged insubordinate conduct. The suspension ultimately transformed into a termination.

Under these circumstances, the Court's inquiry must necessarily be limited. The Court is concerned with "the perception of the decision maker in considering whether the employee was meeting job expectations at the time of dismissal." *Pettis*, 980 F. Supp. 2d at 725 (citing *Evans*, 80 F.3d at 960-61). An employer's expectations are considered "legitimate" "unless they are proven to have been a mere 'sham designed to hide the employer's discriminatory purpose.'" *Pettis*, 980 F. Supp. 2d at 725 n.5 (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006)). Critically, the Court does not "sit as some sort of general personnel management bureau, burdened with the duty to examine or second guess the ultimate wisdom or folly" of an employer's business decisions. *Propst v. HWS Co., Inc.*, 2015 U.S. Dist. LEXIS 163717, at *53 (W.D.N.C. 2015) (Voorhees, J.). However, the Court must not forget the posture of its review. The Court is evaluating the facts to determine only whether Plaintiff has stated a *prima facie* case of

discriminatory termination. "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Based on this evidence, the Court finds it undisputed that Ashworth could request that Plaintiff operate both the hoppers on Lines One and Three during his last night shift as a legitimate expectation of his employment with Dalco. However, the evidence also shows that Dalco would only legitimately expect an employee to run more than one hopper where it is *both* necessary and possible to do so. *See*, *e.g.*, [Doc. No. 52] at pp. 45-47 (Ashworth Depo.). Defendant argues Plaintiff has not established a *prima facie* case for discriminatory termination because he flatly refused to carry out Dalco's request, and thus refused to perform a legitimate expectation of his employment. Plaintiff argues that a dispute exists as to whether he could, in fact, physically carry out the request to run both hoppers that night. The record, taken in the light most favorable to Plaintiff, supports Plaintiff's argument at this juncture.

An employee makes the minimal showing that he was meeting his employer's legitimate expectations where he can demonstrate that he was generally satisfying his employer's relevant, objective performance standards at the time of his termination. *See*, *e.g.*, *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 766 & n.1 (4th Cir. 2003); *Carrier v. VCA Animal Hosps., Inc.*, 2012 U.S. Dist. LEXIS 113595, at *31-32 (D.Md. 2012). Here, construed in the light most favorable to Plaintiff, the evidence suggests that Plaintiff attempted to run both hoppers that night but was physically unable to continue because the hopper on Line Three was running faster than the hopper on Line One. The evidence shows that Dalco would not legitimately expect its employees to run more than one hopper unless it was *both* necessary (which it was) *and* possible (to which there is a dispute). While Defendant claims Plaintiff was completely insubordinate, a

reasonable trier of fact could infer that Plaintiff attempted to comply with Dalco's directive despite his initial objection.

Moreover, testimony from Joy Evans revealed that Plaintiff's conduct and performance on the night in question was not such that "immediate" termination was warranted. *See* [Doc. No. 51] at pp. 87-88 (J. Evans Depo.). Defendant has produced evidence of only two disciplinary actions taken against Plaintiff during his employment, none (admittedly) serious enough to warrant dismissal, and none relating to insubordination or his ability to meet the physical demands of his position. Instead, the evidence shows that, up until his last night shift, Plaintiff was performing his duties to the satisfaction of his employer. Thus, despite Defendant Dalco's argument and evidence that Plaintiff may have been insubordinate on the night in question, enough evidence exists to create a triable issue of fact on the challenged prong of Plaintiff's *prima facie* case.

Accordingly, the Court **GRANTS** summary judgment to the Defendant on Plaintiff's disparate treatment claim respecting Ashworth's verbal reprimand but **DENIES** Defendant's Motion with respect to Plaintiff's claim for discriminatory termination.

*2.    Hostile Work Environment Claims*

Plaintiff next argues that Defendant is liable under Title VII for the creation of a racially hostile work environment. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To establish a hostile work environment claim, a plaintiff must show that there is (1) unwelcome conduct; (2) based on the plaintiff's race; (3) that is sufficiently severe or pervasive enough to alter the plaintiff's conditions

of employment and to create an abusive work environment; and (4) that is imputable to the employer. *Boyer-Liberto*, 786 F.3d at 277.

Defendant has challenged whether Plaintiff can establish a *prima facie* case of a racially hostile work environment under prongs two, three, and four. Specifically, Defendant moves on four key points: (1) that Logan's text message did not result in a tangible adverse employment action against Plaintiff, (2) that neither Logan's conduct (prior to the text message) nor Sherman's conduct was racially motivated, (3) that neither Logan nor Sherman's conduct was severe or pervasive, and (4) that, in any event, Logan and Sherman's conduct cannot be imputed to Dalco.[9] [Doc. No. 41-1] at pp. 10-12 (Defendant's Motion). Though not presenting a model of clarity, Plaintiff opposes the Defendant's Motion by highlighting the variety of physical and verbal assaults Logan directed toward Plaintiff during his employment to show that a genuine dispute for trial remains. *See* [Doc. No. 42] at pp. 5-6, 16, 18 (Plaintiff's Opposition Brief). Plaintiff also recounts his numerous encounters with Sherman, including Sherman's use of the word "boy" while threatening to accost Plaintiff with a forklift. [Doc. No. 42] at pp. 3-5, 14-18 (Plaintiff's Opposition Brief). Plaintiff claims that the text message and verbal/physical assaults were motivated by racial animus.

### i. BASED ON RACE

To establish that harassment was based on race, Plaintiff "must show that 'but for' his race . . . , he would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *see also Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000).

---

[9]  The Court summarily dismisses Defendant's argument regarding a tangible adverse employment action. Defendant's argument that Logan's text message did not result in an adverse employment action against Plaintiff is unpersuasive because a hostile work environment claim does not necessitate an adverse employment action – rather, a tangible adverse employment action is only necessary to make the employer *strictly* liable for a supervisor's harassing conduct, here Logan's conduct. *See*, *e.g.*, *Vance*, 133 S. Ct. at 2439. Merely pointing out the absence of an adverse employment action is insufficient to negate Dalco's potential liability to Plaintiff.

Defendant has failed to show that there is no triable issue regarding whether Sherman's conduct was race-based. On Plaintiff's first day of employment, Sherman told Plaintiff that Dalco experiences "a lot of racial turnover" and asked Plaintiff if "[he] think[s] [he is] going to be around?" [Doc. No. 54] at p. 268-69 (Plaintiff Depo.). Thereafter, Sherman repeatedly hassled Plaintiff, threatening to "get rid" of him on multiple occasions. Sherman's treatment of Plaintiff culminated in an incident where Sherman placed Plaintiff in fear for his safety by threatening "to run this boy over." *Id.* at 169, 262 (Plaintiff Depo.). Plaintiff subjectively considers the term "boy" to be racial and offensive. Prior courts have found the term "boy" to create a triable issue of fact regarding whether the speaker had discriminatory intentions. *See*, *e.g.*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that referring to employees as "boy" could be evidence of discriminatory intent when considered with factors "including context, inflection, tone of voice, local custom, and historical usage"); *White v. BFI Waste Services, LLC*, 375 F.3d 288, 297 (4th Cir. 2004) (recognizing that "boy" was one term of many that could create triable issue of fact on hostile work environment claims when used against employees).

Considering all the circumstances and the context of the facts presented, a reasonable fact finder could find that Sherman's conduct was race-based. When Sherman first encountered Plaintiff, he made a racially-tinged comment about how racial minorities do not fare well at Dalco, and questioned whether Plaintiff would either. Thereafter, Sherman repeatedly threatened to "get rid" of Plaintiff. Each of these comments harkened back to his initial conversation with Plaintiff – i.e., questioning whether a minority should or could work at Dalco. These acts culminated with Sherman threatening Plaintiff's safety with an industrial machine while uttering the racially-charged term "boy." These circumstances arguably draw into question Sherman's interactions with the Plaintiff. *See*, *e.g.*, *Getsie Kiruba Diamond v. Bon Secours Hosp.*, 2009 U.S. Dist. LEXIS

132588, at *8-9 (D.Md. 2009). The Court finds that a triable issue exists regarding whether Sherman's treatment of Plaintiff was based on Plaintiff's race.

Likewise, the Court finds that a triable issue exists regarding whether Logan's conduct toward Plaintiff was based on race. Plaintiff testified that Logan always used the N-word toward him. [Doc. No. 54] at p. 132 (Plaintiff Depo.). Indeed, the evidence clearly shows that he used it via text message. Defendant maintains that Logan used the racial slur only once; however, Plaintiff's testimony presents evidence that Logan spoke to him in this manner on a more regular and consistent basis. At this juncture, the Court must credit Plaintiff's testimony and construe it in his favor. Accordingly, the use of repugnant racial slurs in conjunction with harassing physical and verbal abuse pollutes Logan's interactions with Plaintiff with the implication of racial animus. *See*, *e.g.*, *Getsie Kiruba Diamond*, 2009 U.S. Dist. LEXIS 132588, at *8-9; *accord Bernard v. Calhoon Meba Engineering School*, 309 F. Supp. 2d 732, 738 (D. Md. 2004) ("In particular, [the] use of 'nigger' . . . is the essence of despicable racial animus."); *Jones v. City of Boston*, 738 F. Supp. 604 (D. Mass. 1990) ("Without question, the racial epithet of 'nigger' shows an intent to discriminate on the basis of race.); *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*."). As with Sherman, a reasonable trier of fact could conclude that Logan harassed Plaintiff because of his race.

ii.    SEVERE OR PERVASIVE

With regard to the severity or pervasiveness of the conduct at issue, this element must be examined under a "totality of the circumstances" standard. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See Spriggs*, 242 F.3d at 184 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive. *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). While "viable hostile work environment claims often involve repeated conduct[,] . . . an 'isolated incident' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *See Boyer-Liberto*, 786 F.3d at 277 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal citations and changes in original omitted). However, complaints "premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII." *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007).

Here, Defendant has failed to show that Sherman's conduct does not create a triable issue on the "severity" element of Plaintiff's hostile work environment claim. Prior to the forklift incident, the Court agrees with Defendant that Sherman's behavior amounted to no more than "isolated incidents" of harassment that may have been "rude treatment," "callous behavior," and "simple teasing" that did not change Plaintiff's terms and conditions of employment.[10]  *See* [Doc. No. 41-1] at pp. 9-12 (Defendant's Motion); *Faragher*, 524 U.S. at 788; *Gilliam*, 474 F.3d at 142. However, Sherman's conduct crossed the line into actionable territory once he threatened Plaintiff's safety with an industrial machine while uttering what a reasonable jury could conclude to be a racially-charged slur. The Court considers this circumstance distinguishable from those

---

[10]  This includes where Sherman scratched Plaintiff's name off his locker and made statements regarding Plaintiff getting Logan fired. Even though the cutting of Plaintiff's locks has not been attributed to Sherman, even if those acts were found to have been committed by him, they would fall into this category as well.

cases which hold that a co-worker's limited expression of offensive epithets does not rise to the level of actionable conduct under Title VII because Sherman's use of the term "boy" was coupled with an act of intimidation *and* a threat of violence against Plaintiff. *Compare Fulford v. Daughtry*, 2013 U.S. Dist. LEXIS 80495, at *36-38 (E.D.N.C. 2013) *with Henderson v. Labor Finders of Virginia, Inc.*, 2013 U.S. Dist. LEXIS 47753, at *24-25 (E.D.Va. 2013); *accord Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 209 (4th Cir. 2014) (highlighting the "physically threatening or humiliating" character of a harasser's conduct as an important factor in a court's calculus). The Court finds a triable issue on Sherman's conduct. *See Boyer-Liberto*, 786 F.3d at 277.

Defendant has also failed to show that Logan's conduct does not create a triable issue on the "severe" *or* "pervasive" elements of Plaintiff's hostile work environment claim. In its brief, Defendant argues that Logan's text message cannot be considered "severe" because it was "isolated" and was a "far cry from an environment of crude and racist conditions . . . [that] altered the conditions of Plaintiff's employment." [Doc. No. 41-1] at p. 11 (Defendant's Motion). Defendant cites the Court to several cases that it contends establish the threshold for "severity" in the racially hostile work environment context, such as where an employee is subjected to daily humiliation and assaults that clearly derive from unlawful motives. *See id.* (citing *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002); *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199 (4th Cir. 2000); *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995)). The Court has considered Defendant's argument and rejects it.

Noticeably absent from the Defendant's Motion is a discussion about Plaintiff's testimony that Logan used the N-word toward him on multiple occasions – preceding the text message. Multiple uses of this derogatory term sufficiently colors Logan's behavior toward Plaintiff (prior to the texting incident) so as to create a triable issue on both the severe and pervasive elements of

his claim. The Court is also persuaded that Plaintiff has presented a triable issue regarding whether the text message *itself* was of such character as to be considered a single instance of "extremely serious" conduct. *See Boyer-Liberto*, 786 F.3d at 277. While Defendant claims that the text message was isolated and contained, this argument is easily overcome by the sheer historical weight of the term utilized by Logan. As the Fourth Circuit has appropriately observed, use of "the word 'nigger' is pure anathema to African-Americans, as it is to all of us." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015) (citing *Spriggs*, 242 F.3d at 185) (internal citation omitted); *see also Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). "[U]se of that word is the kind of insult that can create an abusive working environment in an instant, and is degrading and humiliating in the extreme." *Pryor*, 791 F.3d at 496.

Defendant attempts to minimize the severity of Logan's use of the N-word by repeatedly highlighting Logan's African-American ethnicity; however, a racial minority should not be deprived of his right to be free from racially repugnant names, especially of the sort at issue here, simply because he and the offender share the same race. *See, e.g.*, *Ross v. Douglas County*, 234 F.3d 391, 396 (8th Cir. 2000) ("[T]he only reason Ross was called a 'nigger' was because he was black – that Johnson was also black does not alter this."); *Collier v. Ram Partners, Inc.*, 159 F. Supp.2d 889, 900 (D.Md. 2001) ("That a generation of African-Americans exists for whom the use of the 'ancient epithet'. . . is genuinely hurtful and damaging is a fact to be celebrated in law, not dismissed as inexplicable or inherently incredible."); *accord Bernard v. Calhoon MEBA Eng'g Sch.*, 309 F. Supp. 2d 732, 739 n.7 (D.Md. 2004) ("Title VII guarantees to individuals, not only to groups, the right to work in a harassment-free environment."). Defendant has pointed this Court to no case law which considers "minority on minority" racial harassment to be any less severe or

actionable than "white on minority" harassment. Without controlling authority on this point, the Court will not construe Title VII to carry this sort of limitation on the right to be free from racial harassment.

In short, Plaintiff claims that the N-word is racist to him in every context, and a reasonable person could share his view. As Defendant acknowledges, the severity of Logan's use of the term and his conduct is only enhanced by the fact that Logan had supervisory authority over the Plaintiff. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character."); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("[A] supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals."); *accord* [Doc. No. 41-1] at p. 10 (Defendant's Motion). The Court finds that Plaintiff has established a jury issue regarding whether Logan's conduct was severe, pervasive, and "extremely serious."

### iii.    IMPUTATION OF LIABILITY

Finally, under Title VII, liability for a racially hostile work environment is automatically imputed to an employer if the hostile work environment is created by the conduct of the victim's supervisor. *See Boyer-Liberto*, 786 F.3d at 278. The imputation of liability is indefensible if the supervisor's harassing behavior "'culminates in a tangible employment action' . . . ." *Id.* (quoting *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013)). However, if the supervisor's harassing behavior does not result in a tangible employment action, the employer may escape imputed liability by demonstrating that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 133 S. Ct. at 2439. If the hostile work environment is created by the victim's co-worker, then liability is only imputed

to the employer if "it was negligent in controlling working conditions." *Boyer-Liberto*, 786 F.3d at 278; *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it.").

Defendant has failed to show that there is no triable issue on the imputation of liability based on Logan's conduct. In its brief, Defendant mischaracterizes the *Vance* affirmative defense with respect to supervisors. Defendant seems to argue that the affirmative defense is met where an employer exercises reasonable care to prevent and correct any harassing behavior *or* where the plaintiff unreasonably fails to take advantage of the preventive or corrective opportunities provided by the employer. *See* [Doc. No. 41-1] at p. 12 (Defendant's Motion). This is incorrect. The Supreme Court has held that, to establish this affirmative defense, *both* elements are "necessary." *See Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Boyer-Liberto*, 786 F.3d at 278. Defendant has only presented evidence on the first element – not the second (i.e., whether Plaintiff reasonably took advantage of the preventive or corrective opportunities provided by Dalco, such as his use of the complaint procedure contained in its Anti-Discrimination Policy). For this reason, the Defendant has failed to carry its burden on summary judgment with respect to its affirmative defense to Logan's conduct.

Defendant has also failed to show that there is no triable issue on the imputation of liability based on Sherman's conduct. As the Court holds above, the only triable conduct that exists with regard to Sherman is whether his threat to "run this boy over" with a forklift was based on race and "extremely serious." *See*, *supra*. Plaintiff testified that Greenwood was within earshot of this incident, yet did nothing. Greenwood does not remember speaking with Sherman about the incident. Sherman was not reprimanded for the incident until December 2013 – long after this

lawsuit was filed. While there is evidence that Plaintiff did not utilize the reporting procedures of Dalco's Anti-Discrimination Policy by reporting this specific incident to Joy Evans during his January 10, 2013 meeting with her, there is evidence that he generally alerted Mrs. Evans to Sherman's harassing conduct. Further, there is evidence that Scott Greenwood failed to abide by Dalco's Anti-Discrimination Policy by not investigating or reprimanding Sherman for the incident. Indeed, evidence suggests that Greenwood was not particularly concerned with Sherman's conduct, telling Joy Evans that the forklift incident was just "Ralph being Ralph." The Court finds that there is a triable issue regarding whether Dalco knew or should have known about the forklift incident and whether it failed to take reasonable and effective action to stop it. *See Ocheltree*, 335 F.3d at 333-34.

To be sure, on this record, some factors pull toward a finding that Sherman and Logan's offensive behavior was actionable, while other factors pull in the opposite direction. But this Court is not called upon to weigh that evidence at this stage in the litigation. *Walker*, 775 F.3d at 209. Instead, the Court's task is simply to examine whether the record contains proof from which a reasonable trier of fact could conclude "that the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creat[e] an abusive atmosphere." *Id.* The Court finds that there is a genuine dispute of material fact on Plaintiff's hostile work environment claim. Consequently, Defendant's motion for summary judgment on this issue is **DENIED**.

### 3. Retaliation

Defendant also moves for summary judgment on Plaintiff's Title VII retaliation claim. Under Title VII, a plaintiff establishes a *prima facie* claim for unlawful retaliation by showing: (1) he engaged in protected activity; (2) he experienced an adverse employment action; and (3) a

causal link exists between the two events. *See Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410 (4th Cir. 2013); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005). In so moving, Defendant has challenged only whether Plaintiff has established the causation element of his claim. [Doc. No. 41-1] at pp. 13-14 (Defendant's Motion). In arguing against causation, Defendant cites a recent Supreme Court decision which enunciates a standard requiring that a Plaintiff show "but-for" causation in the retaliation context. *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)). Defendant argues that Plaintiff's *prima facie* case requires a showing of "but-for" causation and that Plaintiff has not made that showing.

However, the Fourth Circuit has clearly held that the *Nassar* standard does not affect the Plaintiff's *prima facie* case as it relates to causation. *See Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 251 (4th Cir. 2015) ("We . . . hold that *Nassar* does not alter the causation prong of a *prima facie* case of retaliation."). Instead, *Nassar* merely serves to remove "mixed-motive" liability from the context of Title VII retaliation claims. *Id.* at 246. Because *Nassar* does not alter the long-established application of the *McDonnell Douglas* proof scheme in Title VII retaliation claims, Defendant's citation and argument must be cast aside. *See*, *generally*, *Foster*, *supra*.

Plaintiff argues that he has established causation for purposes of his *prima facie* case by arguing that his suspension and termination were close in temporal proximity to his engagement in protected activity. Plaintiff shows that he was suspended and terminated approximately two months after he filed his first EEOC charge, which was filed on November 15, 2012, and within nine days of his meeting with Joy Evans, wherein he complained of Sherman's harassing conduct.[11] [Doc. No. 42] at p. 19 (Plaintiff's Opposition Brief). Record evidence tends to show that Joy Evans was aware of both these events at the time Plaintiff claims she suspended and terminated him.

---

[11] Defendant has not challenged whether these acts constitute "protected activity" in the retaliation context, and the Court expresses no opinion on the matter.

Under Fourth Circuit precedent, the length of time between the date Plaintiff filed his first EEOC charge and his suspension/termination is sufficient to establish causation at the *prima facie* stage, however weak that causative link may be. *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding that, though a two and a half month gap between plaintiff's protected activity and an adverse employment action implied a weak causal link, such link was sufficient to satisfy the "less onerous" burden of the plaintiff's *prima facie* case); *accord Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (favorably citing *King*). Accordingly, Defendant's motion for summary judgment as to Plaintiff's Title VII retaliation claim is **DENIED**.

### 4. Individual Capacity Claims

Finally, the Court has reviewed the Plaintiff's Second Amended Complaint and it appears that the Plaintiff *still* asserts Title VII claims against Defendants Logan and Sherman in their individual capacities. *See* [Doc. No. 27] at p. 4 (Second Amended Complaint). Plaintiff continues to assert these claims despite being previously informed by this Court that claims against individuals in their individual capacities are untenable under Title VII. *See Reid v. Dalco Nonwovens, LLC*, 2014 U.S. Dist. LEXIS 98642, at *12-13 (W.D.N.C. 2014). Consequently, the Court *sua sponte* **GRANTS** summary judgment to Defendants Logan and Sherman with respect to Plaintiff's individual capacity Title VII claims.[12]

## C. State Law Claims

### 1. Wrongful Termination in Violation of Public Policy

#### i. CLAIM AGAINST DALCO

Defendant moves for summary judgment on Plaintiff's wrongful termination claim by arguing that there is no evidence that Plaintiff was terminated by Dalco, and by generally

---

[12] Because the Court was previously presented with argument on this issue, ruled on this issue, and allowed Plaintiff leave to amend his complaint accordingly, which he did not properly do, the Court need not provide the Plaintiff with Rule 56(f) notice of its intent to *sua sponte* grant summary judgment in Defendants' favor on this issue. *See* Fed. R. Civ. Pro. 56(f).

reiterating its arguments against Title VII liability. North Carolina's recognition of wrongful termination claims is narrow, but North Carolina courts do recognize such claims where an employee's termination "offends public policy." *See Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 332, 493 S.E.2d 420 (1997). One such policy is expressed in N.C.G.S. § 143-422, which recognizes the right of all persons "to seek, obtain and hold employment without discrimination or abridgment on account of race, religion, color, national origin, age, sex or handicap." N.C.G.S. § 143-422.2.

Notably, public policy claims based on N.C.G.S. § 143-422 are confined solely to terminations. *See Moore v. Time Warner Cable, Inc.*, 2009 U.S. Dist. LEXIS 104979 (W.D.N.C. 2009), *adopted by* 2009 U.S. Dist. LEXIS 104976 (W.D.N.C. 2009) (Voorhees, J.). "North Carolina courts 'look to federal decisions [in employment cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.'" *Matthews v. Novant Health, Inc.*, 2010 U.S. Dist. LEXIS 52075, at *19 (W.D.N.C. Apr. 29, 2010) (quoting *N.C. Dept. of Correction v. Gibson*, 308 N.C. 131, 136, 301 S.E.2d 78 (1983)), *adopted by* 2010 U.S. Dist. LEXIS 52077 (W.D.N.C. 2010). Plaintiff's wrongful termination claim is "inextricably linked" to his Title VII claims. *See Clemmons v. NVT Techs., Inc.*, 2015 U.S. Dist. LEXIS 86983, at *20-21 (M.D.N.C. 2015).

In his Second Amended Complaint, Plaintiff claims wrongful termination because of unlawful discrimination based upon his race. [Doc. No. 27] at p. 5 (Second Amended Complaint). Defendant argues that Plaintiff was never discharged, but that he quit. [Doc. No. 41-1] at pp. 14-15 (Defendant's Motion). The Court has already held that a dispute of fact exists regarding whether Plaintiff quit his job or was terminated by Joy Evans. *See*, note 8, *supra*. Further, because Plaintiff's wrongful termination claim and Title VII discriminatory discharge claim are

coextensive, Defendant's general and non-specific challenge to Plaintiff's *prima facie* case is governed by the Court's ruling above regarding his Title VII claim for discriminatory discharge. Consequently, Defendant's motion for summary judgment as to Plaintiff's wrongful termination claim is **DENIED**.

ii.   INDIVIDUAL CAPACITY CLAIMS

To the extent Plaintiff alleges individual capacity claims against Defendants Logan and Sherman relating to wrongful termination, the Court *sua sponte* **GRANTS** summary judgment to those Defendants. The reasons underlying the Court's *sua sponte* grant of summary judgment are outlined in Section II.B.4., *supra*.

2.   *Intentional Tort Claims Against Dalco*

Defendant moves for summary judgment on Plaintiff's claim of intentional infliction of emotional distress and on his claim for assault. Defendant moves solely on the basis as to whether the intentional acts of Logan and Sherman can be imputed to Dalco.[13] [Doc. No. 41-1] at pp. 15-18 (Defendant's Motion). Under North Carolina law, an employer may be held liable under the principles of *respondeat superior* for the intentional tortious acts of its agents in only three situations: (1) when the agent's actions are expressly authorized by the principal; (2) when the action is committed within the scope of the agent's employment and in furtherance of the employer's business; or (3) when the agent's actions are ratified by the principal. *Salley v. Petrolane, Inc.*, 764 F. Supp. 61, 63 (W.D.N.C. 1991); *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986).

Plaintiff has presented no evidence that Logan and Sherman's intentional conduct was either authorized or ratified by Defendant. *See Hogan*, 340 S.E.2d at 121. Indeed, the evidence

---

[13]  Though Defendant has cited law regarding whether Logan and Sherman's conduct was "extreme and outrageous," Defendant makes no argument respecting whether the conduct *was* "extreme and outrageous."

appears to show the contrary. The record contains evidence that Dalco instituted an Anti-Discrimination Policy, which prohibits its employees from engaging in intentionally malicious and harassing conduct. With such a policy in place, Plaintiff has failed to show that Dalco authorized either Logan or Sherman's behavior. Moreover, Plaintiff has presented no evidence indicating that either of the Evanses or Greenwood ratified the individual Defendants' behavior. Plaintiff's conclusory argument that Defendant Dalco's failure to reasonably investigate constitutes ratification is not supported by any cited case law. Further, an employee's intentionally malicious conduct falls outside the bounds of the employment relationship as a matter of law. *See*, *e.g.*, *Troxler v. Charter Mandala Center, Inc.*, 89 N.C. App. 268, 271-72, 365 S.E.2d 665, 668 (N.C. Ct. App. 1988). Accordingly, summary judgment as to Plaintiff's intentional tort claims against Dalco is **GRANTED**.

### 3.     *Negligence Claim Against Dalco*

Lastly, Defendant moves for summary judgment on Plaintiff's negligent infliction of emotional distress ("NIED") claim against Dalco. Defendant's sole argument against this claim is that an NIED claim cannot be based upon intentional conduct. [Doc. No. 41-1] at pp. 16-17 (Defendant's Motion). Plaintiff responds that this claim is premised upon Dalco's failure to investigate Plaintiff's reports of misconduct relating to Sherman and Logan. [Doc. No. 42] at pp. 21-22 (Plaintiff's Motion). An NIED claim requires showing: (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as 'mental anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress. *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (N.C. 1990).

Defendant's argument misunderstands the Plaintiff's claim. It is not premised upon the intentional conduct of Dalco's employees – rather, it is premised upon Dalco's own negligent failure to discover and/or correct that behavior. Thus, Defendant's argument misses the point and summary judgment is not appropriate on the basis argued by it.

Nevertheless, the Court has reviewed the entirety of the record and is unconvinced that the Plaintiff has met his burden to show that he has, in fact, suffered "severe emotional distress." *See Johnson*, 395 S.E.2d at 97; *see also Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (N.C. 1992). "Severe emotional distress" means "any . . . type of severe and disabling emotional or mental condition [that] may be generally recognized and diagnosed by professionals trained to do so." *Johnson*, 395 S.E.2d at 97 (adopting this standard for NIED); *see also Waddle*, 414 S.E.2d at 27 (adopting this definition for IIED). While "[p]roof of severe emotional distress does not necessarily require medical evidence or testimony," there must be "real evidence of severe emotional distress" in the record in order for such a claim to surpass summary judgment. *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (N.C. Ct. App. 2003) (internal quotation marks omitted). Under North Carolina law, the "severe emotional distress" element is a tall order to fill. Indeed, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Waddle*, 414 S.E.2d at 27-28 (quoting Restatement (Second) of Torts § 46 cmt. j (1965) (emphasis omitted)).

Reviewing Plaintiff's deposition testimony, the Court notes that Plaintiff did begin seeing two mental health specialists in the first "three to four weeks" following the events surrounding his departure from Dalco. *See* [Doc. No. 54] at pp. 45-46, 205, 208-209, 213 (Plaintiff Depo.). Plaintiff began seeing the specialists because he needed to "get some help." *Id.* Plaintiff testified that he needed to get help because, following his termination, "[r]elations with [his] girl" suffered

and he was unable to "provide for [his] family." *Id.* at p. 205 (Plaintiff Depo.). After leaving Dalco, Plaintiff and his significant other began arguing regularly and their sexual interactions decreased. *Id.* at pp. 205, 287-89 (Plaintiff Depo.). Plaintiff generally testified to having "emotional" issues deriving from his termination. *Id.* at pp. 207-208 (Plaintiff Depo.). Testimony also shows that Plaintiff began suffering from increased stress, which he testified as causing him to "constantly smoke" to alleviate his "[n]erves." *Id.* at pp. 286-87 (Plaintiff Depo.). Plaintiff also currently takes two medications – one to help him sleep and the other to help him get "motivate[d] a little bit during the day." *See* [Doc. No. 54] at p. 11 (Plaintiff Depo.). Plaintiff also testified that he and his significant other were caring for a new-born child, who, at the time of the deposition, was seven and a half months old. *Id.* at pp. 291-92 (Plaintiff Depo.). Plaintiff has produced no evidence[14] from any medical professional that indicates that he has suffered from severe emotional distress since leaving Dalco. The Court is also unaware of any expert designations Plaintiff has made in anticipation of proving this element at trial.

Based on this record, the Court believes Plaintiff has failed to create a genuine issue of material fact for trial regarding whether he has suffered the "severe emotional distress" that is necessary for his NIED claim. Testimony regarding increased stress, sleeplessness, and lack of motivation is insufficient to create a triable issue on this claim. *See*, *e.g.*, *Johnson v. Scott*, 137 N.C. App. 534, 528 S.E.2d 402, 405 (N.C. Ct. App. 2000) (affirming summary judgment for the defendant where the plaintiffs stated that they suffered from nightmares, were afraid of the dark, and had stress-related illnesses); *Strickland v. Jewell*, 562 F. Supp. 2d 661, 676-77 (M.D.N.C. 2007) (granting summary judgment to the defendants where the plaintiff alleged suffering "difficulty sleeping, nightmares, decreased appetite, and generally increased stress and fatigue").

---

[14] Either affidavit, deposition, or medical record evidence.

In addition, while testimony establishing a decrease in one's sexual undertakings should be considered and is certainly an undesirable outcome, without more, such testimony hardly establishes "severe emotional distress." *See*, *e.g.*, *Castonguay v. Long Term Care Mgmt. Servs., LLC*, 2014 U.S. Dist. LEXIS 59881, at *45-48 (M.D.N.C. 2014). Finally, the lack of any testimony regarding a diagnosis or any other medical evidence which points to Plaintiff's alleged "severe emotional distress" satisfies the Court that there is no genuine issue for trial on this claim. *See*, *e.g.*, *Williams v. HomEq Servicing Corp.*, 184 N.C. App. 413, 646 S.E.2d 381, 385 (N.C. Ct. App. 2007) (summary judgment to the defendant proper where the plaintiffs' sole evidence consisted of testimony stating that they suffered from chronic depression, and they were never diagnosed by any doctor of any type of severe mental condition); *Collins v. Chem. Coatings, Inc.*, 2010 U.S. Dist. LEXIS 32369 (W.D.N.C. 2010) (granting summary judgment for the defendant where the plaintiff failed to provide sufficient medical documentation of severe and disabling psychological problems in order to substantiate her claim of emotional distress); *accord Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 579 S.E.2d 505, 508 (N.C. Ct. App. 2003) ("[A]ppellate decisions have consistently upheld dismissal of NIED and similar claims, where a plaintiff fails to produce any real evidence of severe emotional distress.").

Accordingly, pursuant to Federal Rule of Civil Procedure 56(f)(2), the Court hereby **NOTIFIES** the Plaintiff that summary judgment will be **GRANTED** to Defendant Dalco on the NIED claim, pursuant to the analysis contained in this Order, unless the Plaintiff **SHOWS CAUSE** by Thursday, January 7, 2016 as to why there is a genuine issue of material fact for trial on the element of "severe emotional distress." Plaintiff is **ORDERED** to "show cause" by way of a supplemental brief that shall be limited in length to **FIVE (5) PAGES**. If Plaintiff fails to file a

supplemental brief, this Order shall operate to grant summary judgment to Defendant Dalco on this claim.

### IV.    DECRETAL

**IT IS, THEREFORE, ORDERED THAT**

(1)    Defendant's Motion for Summary Judgment (Doc. No. 41) is **GRANTED-IN-PART**;

(2)    Defendant's Motion for Summary Judgment (Doc. No. 41) is **DENIED-IN-PART**;

(3)    Summary Judgment is *sua sponte* **GRANTED** to Defendants Logan and Sherman on Plaintiff's Title VII and wrongful termination claims, to the extent such claims are still alleged against such defendants in their individual capacities; and

(4)    Plaintiff is **ORDERED** to **SHOW CAUSE** by Thursday, January 7, 2016 as to why summary judgment should not be entered in Defendant Dalco's favor on his NIED claim because of the specific issue discussed in this Order.

**SO ORDERED**.

Signed: January 4, 2016

Richard L. Voorhees
United States District Judge